# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) NO. 3:18-cr-00146 |
| ANDREW LONG RYAN, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

At the December 12, 2019 status conference, the Government requested a hearing on the issue of involuntary medication to restore Defendant Andrew Long Ryan to competency, and the parties later filed prehearing briefs on this issue. (Doc. Nos. 58, 60.) After the Court held an evidentiary hearing on January 29, 2020, the parties also filed post-hearing briefs. (Doc. Nos. 72, 76.) For the following reasons, the Court will deny the Government's request for involuntary medication.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

On June 20, 2018, Ryan was indicted on two counts of threatening bodily harm to the President of the United States on social media, in violation of 18 U.S.C. § 871. (Doc. No. 10.) If convicted on either count, Ryan faces a statutory maximum sentence of five years' imprisonment. See 18 U.S.C. § 871(a).

The charges in the Indictment arise from Ryan's Facebook and Twitter posts made on May 28 and 29, 2018. Specifically, Ryan posted the following message to Facebook on May 28, 2018:

> This is one of those messages where I started talking, and God took over. Read it.
> It may not make sense now, but it will soon.

> I'm making a point. I'm calling attention to the fact I've warned the President of the United States of death if he doesn't comply with a directive I have given him, to the point of a direct threat on his life, and despite all I have said and tagging so many Federal agencies for weeks, here I am. Where are they? I know where they are. I'm in a unique position. I don't know how or why, but I'm here nonetheless. ME MAKING A PAINT TOO MUXH TINES MOR MIND MIND RHA MIND and MINE. Up. Down. Same. Wee after leaving death. We can stay forever and do nothing, but we wanted to make you. We worked together to make you. I didn't lies. K lies. I told the truth my truth. We don't want bots. We made something special. Leif. Leaves and trees. Two things joined together. I didn't tell everything I knew, but I didn't lie and neither did Andy. He and sleak and speaks for me to you. Men. You are men. He doesn't know what he is. It doesn't matter to him bc he loves me and he loves Paige so to him, he is a man. He's a child of mine and so is she. She comes home to me and so does he, so if you want to live a life of pleasure and fun, come with me. If you don't. Don't. Your choice. Make your choice. How long before WE leave? We left, but we didn't bc we are everywhere. We want to take you to somewhere away from death. Death is death, and we don't know where death takes dead. We do, but we don't. Or we not say. Yo have a choice to make. Make your choices wisely, and choose life. Choose love. It gets better. So much better, but first move Paige and the kids to Andy. Now. - EL ON

(Doc. No. 1 at 3 (spelling and grammatical errors in original).) The next day on May 29, 2018, Ryan posted the following message to Facebook:

> This will all make sense soon.
>
> I'm trying to get the message out, but it's a long and hard road. Think of me as a pop up add for life in an app that needs updating.
>
> I'm swatted away and ignored, but you won't be able to ignore me soon…

(Id.) Ryan made another Facebook post that day stating:

> Paige McKinney Ryan says people are calling and texting her bc they think my posts are violent and that I'm exhibiting psychotic behavior akin to those who shoot up schools. I'm a warning siren, and those who cry the loudest know what I'm talking about. Leave her alone. If you have a problem with anything I say, say it to my face or shut your mouth, and look at your own actions.
>
> Death is coming.

(Id. at 3-4.) Last, Ryan posted the following message to Twitter on May 29, 2019:

> I will kill Donald Trump if you don't follow my leaders lead.

(Id. at 4.)

When Ryan appeared in Court for a July 30, 2018 status conference, his lawyer and the Government expressed concerns about Ryan's competency to stand trial and assist properly in his defense. As a result, the Court ordered a psychiatric or psychological evaluation of Ryan pursuant to 18 U.S.C. § 4241(b), and remanded Ryan to the custody of the Attorney General for placement in a suitable facility for the purposes of receiving that evaluation. (Doc. No. 19.)

On December 18, 2018, Dr. Samuel Browning, a Psychologist at the Federal Medical Center in Fort Worth, Texas, submitted a Psychological Evaluation report diagnosing Ryan with "acute symptoms of Schizophrenia," and opining that "Ryan is not currently competent to proceed" with trial because he "appears to currently suffer from a mental disease rendering him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense." (Doc. No. 21 at 7-8.) Based on Dr. Browning's report and the evidence presented at the January 16, 2019 competency hearing, the Court remanded Ryan to the custody of the Attorney General for a period not to exceed 120 days to determine whether Ryan's competency could be restored. (Doc. No. 29 (citing 18 U.S.C. § 4241(d)).) After receiving Ryan's Federal Rule of Criminal Procedure 12.2(a) "notice of his intent to assert a defense of insanity at the time of the alleged offense" (Doc. No. 28), the Court also ordered that Ryan be evaluated on the question of whether he was insane at the time of the offense charged under 18 U.S.C. §§ 4247(b) and (c) (Doc. No. 30).

After several administrative delays (see Doc. Nos. 34, 39), Ryan was admitted to the United States Medical Center in Springfield, Missouri ("FMC Springfield"), on June 27, 2019, to undergo a psychiatric evaluation. (Doc. No. 42.) Dr. Lea Ann Preston Baecht conducted the evaluation and submitted a Forensic Report dated October 29, 2019, diagnosing Ryan with Schizoaffective Disorder and opining that "Ryan remains incompetent to proceed [with trial] at the present time,

3

and he is unlikely to be restored to competency in the foreseeable future in the absence of antipsychotic medication." (Doc. No. 49 at 9-10.) In her report, Dr. Baecht also noted that Ryan "is not judged to be dangerous to himself or others in this environment."[1] (Id. at 11.) Dr. Baecht further reported that "[a]lthough the Court also requested that Mr. Ryan's mental state at the time of the alleged offenses be evaluated to determine if he met the criteria for insanity at the time of the alleged offenses, his current psychotic mental state precluded the completion of the sanity evaluation at this time." (Id. at 2.)

On December 12, 2019, the Court held a status conference to discuss the findings in Dr. Baecht's report. At that status conference, the Government made an oral request for a Sell v. United States, 539 U.S. 166 (2003) evidentiary hearing, which the Court construed as a motion for an order authorizing the involuntary administration of medication to restore Ryan to competency. (See Doc. No. 52.) The parties filed prehearing briefs (Doc. Nos. 58, 60) and Dr. Robert G. Sarrazin, the Chief of Psychiatry at FMC Springfield, submitted a proposed treatment plan (Doc. No. 61). On January 29, 2020, the Court held an evidentiary hearing on the issue of involuntary medication, during which Dr. Baecht and Dr. Sarrazin testified as experts on the Government's behalf. The parties later submitted post-hearing briefs. (Doc. Nos. 72, 76.)

## II. LEGAL STANDARD

"When the government seeks to involuntarily medicate a mentally incompetent defendant to restore his competency for trial, the government's prosecutorial interest must be balanced against the defendant's significant liberty interest under the Constitution in avoiding the unwanted

---

[1] Dr. Baecht's report also indicated that staff members held "an Involuntary Medication Due Process Hearing pursuant to [28] C.F.R. [§] 549.46 to determine if [Ryan] met the criteria for involuntary administration of psychiatric medication. . . ." (Doc. No. 49 at 8.) "At the conclusion of the hearing, . . . the Hearing Officer, [Dr.] Shawn Rice . . . opined that because Mr. Ryan was not dangerous in a correctional environment or gravely disabled, he did not meet the criteria for the administration of antipsychotic medication on an involuntary basis." (Id.)

4

administration of antipsychotic drugs."[2] United States v. Berry, 911 F.3d 354, 357 (6th Cir. 2018) (quoting Sell, 539 U.S. at 178) (internal quotation and punctuation marks omitted). To secure an order of involuntary medication, the Government bears a significant burden and must establish the following four "Sell factors" by clear and convincing evidence: "(1) the existence of an 'important' governmental interest; (2) that involuntary medication will 'significantly further' the government interest; (3) that involuntary medication is 'necessary' to further those interests; and (4) that administration of the drugs must be 'medically appropriate' for the individual defendant." United States v. Green, 532 F.3d 538, 545 (6th Cir. 2008) (quoting Sell, 539 U.S. at 180–81).

## III. ANALYSIS

The parties' prehearing briefs primarily discuss whether the Government established the first Sell factor by clear and convincing evidence. (Doc. No. 58 at 3-10; Doc. No. 60 at 4-9.) "In order for important governmental interests to be at stake, the defendant must be charged with a serious crime, whether against person or property, the prosecution of which is needed to protect society's 'basic human need for security.'" Berry, 911 F.3d at 360 (quoting Sell, 539 U.S. at 180). "If such a crime is charged, [the Court] must also examine 'the facts of the individual case' to determine if 'special circumstances . . . lessen the importance of [the government's] interest.'" Id. (quoting Sell at 180).

If the Government fails to establish this factor by clear and convincing evidence, the Court need not address the remaining three Sell factors. See Berry, 911 F.3d at 360, 366. Thus, the

---

[2] "The Sell standard applies when the forced medication is requested to restore competency to a pretrial detainee and the pretrial detainee is not a danger to himself or others." United States v. Green, 532 F.3d 538, 545 n.5 (6th Cir. 2008). When the pretrial detainee is a potential danger to himself or others, the Court applies the standard set forth in Washington v. Harper, 494 U.S. 210, 227 (1990). Id. (citing Sell, 539 U.S. at 185). Because Ryan is not a danger to himself or others in an institutional setting (see Doc. No. 49 at 8, 11), the parties agree that the Sell standard applies in this case.

5

Court's analysis in this case begins and ends with whether there is a sufficiently important governmental interest.

A.  Seriousness of the Charged Crime

The government argues that "making threats to kill the President on Facebook and Twitter" is a sufficiently "serious" crime to support an important government interest in prosecuting Ryan. (Doc. No. 58 at 3-4.) In response, Ryan contends that the government does not have a "strong interest in deterring and prosecuting delusional statements from mentally ill people . . . made on social media in a manner that limited their audience to a few concerned family members and people who 'followed' [him] on Twitter." (Doc. No. 60 at 9.) To determine whether a crime is "serious" for purposes of involuntary medication, the Sixth Circuit looks solely to the maximum penalty authorized by statute. United States v. Mikulich, 732 F.3d 692, 696–97 (6th Cir. 2013); Green, 532 F.3d at 550-51. If Ryan is ultimately convicted of the crimes alleged in the Indictment, the maximum penalty authorized by statute is five years imprisonment on each count. See 18 U.S.C. § 871.

This case presents an unsettled issue of law because "the seriousness of a crime that carries a five-year statutory maximum sentence has never been decided by [the Sixth Circuit] in a case where that issue was disputed by the parties," and the Sixth Circuit has been "hesitant to establish a per se rule either that five years is enough, or not enough" to warrant involuntary medication. Berry, 911 F.3d at 360-62. Other circuits have found crimes with a five-year statutory maximum sentence to be sufficiently serious under the first Sell factor. See U.S. v. Nicklas, 623 F.3d 1175, 1178-79 (8th Cir. 2010) (crime of transmitting a threatening communication in interstate commerce); United States v. Onuoha, 820 F.3d 1049, 1051 (9th Cir. 2016) (crime of making phone calls to airport authorities instructing them to evacuate). Likewise, other circuits have determined that the exact crime involved in this case—i.e. making threats against the President of the United

States in violation of 18 U.S.C. § 871—is a "serious crime" for purposes of involuntary medication. See e.g., United States v. Gamarra, No. 17-65 (JDB), 2018 WL 5257846, at *6 (D.D.C. Oct. 19, 2018), aff'd 940 F.3d 1315 (D.C. Cir. 2019); United States v. Pfeifer, 140 F. Supp. 3d 1271, 1277 (M.D. Ala. 2015), aff'd 661 F. App'x 618 (11th Cir. 2016). But unlike courts in the Sixth Circuit, those courts looked beyond statutory maximum or minimum sentences to measure a crime's seriousness and considered factors such as the anticipated United States Sentencing Guideline range or the nature of the charged crime. Unless and until the Sixth Circuit adopts the standards applied in its sister circuits, however, the Court must make its seriousness determination by looking only to the crime's prescribed statutory penalty, as this measurement "provides the most objective view of seriousness because it necessarily takes into account such factors as the nature of the crime, as well as the defendant's characteristics." Green, 532 F.3d at 550-51.

The government attempts to improve its position by arguing that Ryan "is charged with *two* offenses carrying a five-year statutory maximum," so he "is conceivably facing a total term of imprisonment of 10 years, not five. . . ." (Doc. No. 58 at 4-5.) This stacking argument is consistent with at least one district court opinion in the Fourth Circuit[3] finding, without analysis, that "five counts of threatening to kill the President and five counts of mailing a threat to injure another, each of which carries a maximum sentence of five years" was sufficiently serious under Sell because "the defendant face[d] a potential maximum penalty of 50 years. . . ." United States v. Banks, No. 1:13CR00046, 2015 WL 1932928, at *4 (W.D. Va. Apr. 29, 2015). And as discussed in Berry, other courts have found that a potential ten-year sentence can make a crime sufficiently serious to justify involuntary medication. 911 F.3d at 360-61 (collecting cases). However, because the Sixth

---

[3] Courts in the Fourth Circuit also focus solely "on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes." U.S. v. Evans, 404 F.3d 227, 237 (4th Cir. 2005).

Circuit has not specifically addressed this issue, it is unclear whether the Court may aggregate charges or assess the likelihood of concurrent or consecutive sentences when determining whether a crime is sufficiently serious under Sell.

Accordingly, the Court does not have clear guidance from the Sixth Circuit about whether Ryan's charged crimes are sufficiently serious in this case. But following the reasoning in Berry, the Court can still deny the Government's request because the mitigating factors in this case lessen any potential government interest that could warrant involuntary medication. See 911 F.3d at 362 ("[e]ven assuming that a crime with a five-year statutory maximum sentence could qualify as a serious crime for Sell purposes, the mitigating factors . . . lessen the government's interest such that it is insufficient to warrant mandated medication here").

B. Mitigating Circumstances

In determining whether the first Sell factor has been established, the Court must also consider any special circumstances that undermine the important governmental interest at stake. Sell, 539 U.S. at 180. It is the defendant's burden "to demonstrate that the special circumstances of his case undermine the Government's interest." Mikulich, 732 F.3d at 699. Although "[n]o factor on its own outweighs the governmental interest," the combination of all the factors could lessen this interest and make involuntary medication inappropriate. Berry, 911 F.3d at 366.

1. Length of Pre-Trial Confinement

Ryan first argues that the length of his pre-trial confinement compared to his possible sentence mitigates against any potential government interest in this case. (Doc. No. 60 at 5-7.) "[A] lengthy pre-trial confinement which would be credited against 'any sentence ultimately imposed' undercuts the government's interest in prosecution." Berry, 911 F.3d at 362 (quoting Sell, 539 U.S. at 181.) In other words, "[w]here a defendant has already served sufficient time that a guilty verdict will result only in a sentence of time served, the deterrent effect of imprisonment

has evaporated, and the overall governmental interest in prosecution is weakened." Id. at 363. In analyzing this factor, the Court may consider the anticipated Guidelines sentencing range, the sentencing factors under 18 U.S.C. § 3553(a), and "the realities of an individual defendant's likely actual sentence." Id. at 363; United States v. Grigsby, 712 F.3d 964, 972-74 (6th Cir. 2013).

Ryan was incarcerated on June 19, 2018, which means he has been in pre-trial confinement for approximately 20 months. According to the Government's proposed treatment plan, a Sell Order would require at least another four months for Ryan to be evaluated at FMC Springfield. (Doc. No. 61.) Assuming there were no further delays, it would take at least an additional five months for Ryan to be restored to competency, tried and found guilty, and sentenced by the Court. (Id.) Ryan's counsel also indicated he would likely file an interlocutory appeal if the Court issued an involuntary medication order (Doc. No. 60 at 6), and the Sixth Circuit could take 15 months to resolve the appeal.[4] Thus, in an absolute best-case scenario where there were zero delays in Ryan's treatment, trial, or appeal, he would be given at least 44 months credit toward his potential sentence for his time spent in pre-trial confinement. See 18 U.S.C. § 3585(b)(1) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed. . . .")

---

[4] To come up with this 15-month figure, the Court looked at all the publicly available Sixth Circuit decisions dealing with the issue of involuntary medication under Sell, and analyzed the amount of time between the district court's order and the Sixth Circuit's resolution of the related interlocutory appeal in each case. Aside from an unpublished, per curiam opinion in United States v. Dellinger, 588 F. App'x 487 (6th Cir. 2014) that resolved an appeal in approximately 6 months, each of these appeals took over 15 months to resolve. See Berry, 911 F.3d 354 (approximately 15.5 months); Mikulich, 732 F.3d 692 (approximately 16.5 months); Grigsby, 712 F.3d 964 (approximately 21 months); United States v. Payne, 539 F.3d 505 (6th Cir. 2008) (approximately 15.5 months); Green, 532 F.3d 538 (approximately 23 months).

Although the Court is not currently able to determine what Ryan's ultimate Guideline range will be if he is convicted on both counts in the Indictment, it is reasonable to believe that Ryan would receive little to no additional time at sentencing if he undergoes further medical treatment to restore him to competency. As an initial matter, it is highly unlikely that a Court in its discretion would require Ryan's sentence to be served consecutively, particularly because even the Government concedes that Ryan's alleged conduct in this case "would appear to be part of one continuous pattern." (Doc. No. 58 at 5). Moreover, the Guideline for a violation of 18 U.S.C. § 871 is U.S.S.G. §2A6.1, and application note 3 to §2A6.1 provides that "multiple counts involving making a threatening or harassing communication to the same victim are grouped together under §3D1.2." Accord U.S. v. Cousins, 469 F.3d 572, n.1 (6th Cir. 2006) (abrogated on other grounds) ("Because § 3D1.2 provides for grouping of counts involving the same victim, the two counts arising from [defendant's] threats against the President were treated as a single count. . . ."). And even though Ryan is realistically facing a maximum sentence of only five years, not ten, Ryan's Guideline range will likely include less time than the statutory maximum. Ryan predicts that his base offense level would be 12, and that he may receive a 3-level enhancement for involving an "official victim" and another 6-level enhancement for being motivated by the victim's status under §3A1.2.[5] (Doc. No. 60 at 2-3.) In the event all these enhancements apply and Ryan does not receive any credit for acceptance of responsibility, he would face a Guideline range of roughly 37-46 months. Thus, even under the most conservative estimate where Ryan is restored to competency, tried, and sentenced in the next 24 months, he will still have served more time than the low end of his anticipated Guideline range.

---

[5] By making this prediction, Ryan does not waive any rights or concede that any specific Guideline provisions apply in this case. (Doc. No. 60 at 3 n.1.)

Accordingly, Ryan's potential pre-trial confinement compared to his ultimate sentence certainly lessens, if not significantly undercuts, the government's interest in prosecuting him. But because a lengthy pre-trial confinement "does not 'eliminate . . . the importance of the governmental interest in prosecution,'" the Court must also consider additional mitigating circumstances. Berry, 911 F.3d at 363 (quoting Sell, 539 U.S. at 186).

### 2. Nature of the Charged Crimes

Ryan next argues that his alleged threats against the President on social media were non-violent because no one was physically injured, and the Sixth Circuit in Berry held that the non-violent nature of a crime militated against there being an important government interest. (Doc. No. 60 at 7 (citing 911 F.3d at 364).) The Government counters that Ryan's "posts are violent on their face, and are thus distinguishable from the 'non-violent' conduct at issue in Berry." (Doc. No. 58 at 7.) In Berry, the defendant was charged with Conveying False Information Regarding Explosives, in violation of 18 U.S.C. § 1038, because "[h]e allegedly placed a briefcase made to look like a bomb, but containing only papers and no explosives, outside a bank." 911 F.3d at 357. The Court held that because Berry was charged with making threats using a fake bomb, not a real bomb, "it cannot be said that the crime was violent as alleged in the indictment." Id. at 364 (emphasis added); Cf. Mikulich, 732 F.3d at 697 (finding that attempting to actually bomb a federal building unquestionably relates to violent behavior).

Here, the Indictment alleges that Ryan made "a threat to take the life of, to kidnap, and to inflict bodily harm upon the President." (Doc. No. 10.) The standard for assessing a crime's violence appears to be limited solely to what is charged in the Indictment; thus, Ryan's threats are clearly violent as alleged in the Indictment regardless of whether anyone was physically injured. However, Dr. Baecht testified that Ryan posted his threatening social media messages after he was formally diagnosed with Schizoaffective Disorder, and the contents of those messages were

consistent with the same grandiose delusional ideation she observed from Ryan during his psychiatric evaluation.[6] (Doc. No. 81 at 3:15–8:7.) Although, if true, Ryan's threats certainly violate the law, they may have been a product of his mental illness rather than a legitimate threat of violence. Indeed, as another district court explained, "[a] veiled threat to the President packs a symbolic punch, but may not pose a very real risk to the President's safety or the public at large." Pfeifer, 140 F. Supp. 3d at 1277.

Because Ryan's messages can be viewed as either violent as alleged in the Indictment or as veiled, illegitimate threats to the President, the nature of Ryan's conduct neither substantiates nor mitigates against any governmental interest in this case. Accordingly, this factor is neutral to the Court's analysis under Sell.

### 3. Risk of Harm to Himself and Others

In determining whether there are mitigating circumstances under the first Sell factor, the Court may also consider the risk that the defendant will harm himself or others if he is not medicated. Berry, 911 F.3d at 364-65. In Berry, the Sixth Circuit found that "the uncontested evidence that in his current setting [the defendant] poses no appreciable risk to himself or others undercuts the governmental interest necessary to medicate him." Id. at 365 (emphasis added). Here, based on opinions from medical personnel that evaluated Ryan, the parties agree that Ryan is not a risk to himself or others in an institutional setting. (See Doc. No. 49 at 8, 11; see also Doc. No. 58 at 8; Doc. No. 60 at 7.) Although the Government disputes this mitigating factor by suggesting Ryan "would pose a danger to himself or others outside the correctional environment,"

---

[6] An official transcript of the January 29, 2020 Sell hearing is not yet available, but the court reporter has filed an official version of the specific hearing excerpts cited in this Opinion. (See Doc. No. 81.)

(Doc. No. 58 at 8-9 (emphasis added)), that is not the standard articulated in Berry.[7] Accordingly, Ryan's "lack of dangerousness" in an institutional setting undercuts the governmental interest in this case.

### 4. Likelihood of Civil Commitment

The Court may also consider whether Ryan's potential for civil commitment is a mitigating factor. The Sixth Circuit in Berry explained this factor as follows:

> A closely related issue to dangerousness is the likelihood of civil commitment, which is governed by 18 U.S.C. § 4246. If a federal convict has served his sentence, or if a federal defendant has had his charges dropped because of mental incompetence, the government may seek that individual's continued detention in a federal medical facility. If the district court determines "by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," the court shall continue the individual in the custody of the Attorney General. 18 U.S.C. § 4246(d). Under Sell, we must analyze whether [the defendant] will be civilly committed, because "lengthy confinement in an institution for the mentally ill . . . diminish[es] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Sell, 539 U.S. at 180.

911 F.3d at 365. "[T]he mere uncertain possibility of civil commitment is not enough" to diminish the government's interest in prosecution, but "neither is there a requirement that the defendant must prove that civil commitment is a certainty." Id. (citing Grigsby, 712 F.3d at 972).

Although Ryan's potential for civil commitment under § 4246 "is a fact-specific inquiry that cannot be resolved definitively at this point," see Grigsby, 712 F.3d at 971, the parties agree that civil commitment is more than a mere uncertain possibility for him. Specifically, Ryan argues that his likelihood of civil commitment is "far beyond mere possibility" because "he was accused of various actions and statements that made witnesses and law enforcement concerned for the safety of those around him." (Doc. No. 60 at 8 (citing Doc. No. 1 at 3-5).) (Id.) And the

---

[7] The risk Ryan will harm others outside an institutional setting is relevant to his likelihood of civil commitment, as explained in Section III.B.4.

13

Government similarly argues that "it is possible, if not likely, that Ryan could be indefinitely civilly committed because he is simultaneously too dangerous to release and not fully treatable because of his refusal to take antipsychotic medication." (Doc. No. 58 at 15.)

The allegations and evidence in the record could support a finding that Ryan's release would create a substantial risk of bodily injury to another person. According to the Criminal Complaint, Ryan became "combative" with police officers in September 2017 when they responded to his wife's call about his odd behavior, he violated an Emergency Order of Protection by sending his wife threatening text messages, and he had a shotgun, two rifles, and a pistol seized from his bathroom that were arranged in a "last stand" configuration. (Doc. No. 1 at 3-4.) Police have allegedly described Ryan as dangerous, a "ticking time bomb," and that he has "school shooter written all over him," and one of his family members allegedly feared he was "close to committing mass murder." (Id.) Moreover, Dr. Baecht testified at the Sell hearing that Ryan has "some risk factors" of posing a danger to others if released to the community because he has owned weapons and made threats in the past. (Doc. No. 81 at 2:9–3:8.) Accordingly, on balance, the probability that Ryan will be civilly committed significantly undercuts the Government's interest in prosecuting him. See Berry, 911 F.3d at 365-66.

## IV. CONCLUSION

"The drastic step of administering [antipsychotic] drugs to an unwilling criminal defendant should be taken rarely, and only when absolutely necessary to fulfill an important governmental interest, to avoid deprivation of the defendant's 'liberty . . . without due process of law.'" Berry, 911 F.3d at 357 (quoting U.S. Const. amends. V, XIV § 1). For the foregoing reasons, even assuming that Ryan's charged crimes could qualify as "serious" under the first Sell factor, his

unique mitigating circumstances,[8] including the length of his pre-trial confinement, the minimal risk that he will harm himself or others in his current environment, and the likelihood that he will be civilly committed, do not make the drastic step of ordering involuntary medication appropriate in this case. Because the Court finds that the Government has failed to prove by clear and convincing evidence that the involuntary administration of medicine to restore Ryan to competency is appropriate, the Government's motion to do so will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] The Court applied the Sixth Circuit's holding that "where the Government has already demonstrated an important interest in prosecuting the defendant, the potential assertion of an insanity defense does not undermine the Government's interest in taking the case to trial," Mikulich, 732 F.3d at 701, and therefore did not consider Ryan's potential insanity defense for purposes of its Sell analysis. However, the Court notes that this case may be distinguishable from Mikulich, because Ryan filed a notice of his intent to raise an insanity defense at trial (Doc. No. 28). See Mikulich at 701 (noting that Mikulich's insanity "argument is far too speculative to be persuasive" because, among other things, "nothing in the record indicates that Mikulich has given the Government notice of his intent to raise a defense of insanity").